Filed 5/1/26  In re M.A. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.A., et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E087388 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J292389 & J292390) |
| v. | OPINION |
| M.A., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Michelle Lauron, Judge.  Conditionally reversed and remanded with directions.

Donna B. Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Laura Feingold, County Counsel, and Landon Villavaso, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and appellant M.A. II ("father") appeals from an order terminating parental rights over his minor children. He argues San Bernardino County Children and Family Services (the "department") failed to conduct an adequate inquiry under the Indian Child Welfare Act ("ICWA"). The department concedes its ICWA inquiry was inadequate in part. We conditionally reverse to allow the department to conduct a proper ICWA inquiry.[1]

BACKGROUND

Father has two children who are subjects of this dependency: a girl, A.A. (born 2019) and a boy, M.A. III (born 2021).[2] The children have two older maternal half siblings who are also subjects of the dependency but not this appeal, and two older paternal half siblings who are subjects of neither the dependency nor this appeal and who live with father full-time.

**A. Dependency Background**

In February 2022, A.A. and M.A. III lived with mother and their half siblings. Father and mother were separated and father lived in San Diego with the children's paternal half siblings. Father could not leave San Diego because he was on probation.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code. "In addition, because ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'Indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1 (*Benjamin M.*), disapproved on other grounds in *In re Dezi C.* (2024) 16 Cal.5th 1112 (*Dezi C.*).)

[2] The children's mother is not a party to this appeal, so we do not discuss any procedural or factual history pertaining to her alone except as necessary.

That month, the department received a referral alleging mother abused and neglected the children and their maternal half siblings. After investigating, the department determined mother had unresolved mental health issues which presented a danger to the children. It therefore sought and obtained a detention warrant, and detained the children in March 2022.

The department filed a section 300 petition on March 7, 2022. The petition alleged, among other things, that father knew or should have known about mother's untreated mental health issues, failed to protect the children from mother, and left them without provision for support. The court held a detention hearing the next day, found the petition stated a prima facie case, and detained the children.

The court held a jurisdiction hearing in July 2022. It found multiple allegations against both father and mother true. It then held a contested dispositional hearing in August 2022, where it denied mother's request for family maintenance services and ordered reunification services for both parents.

The court held a contested 12-month review hearing in September 2023. After hearing argument and evidence, the court terminated reunification services for both parents. In November 2025—over two years later—the court held a section 366.26 hearing, where it terminated father's parental rights over both children.

**B. ICWA History**

Mother and father initially denied any Indian ancestry, but eventually recanted and identified possible connections to specific tribes.

3

In mother's case, maternal grandmother claimed "French Canadian Native American" ancestry. She said it was through maternal great-grandmother, but that maternal great-grandmother was suffering from Alzheimer's and dementia and would be unable to provide more information. Mother also claimed Blackfeet and Cherokee ancestry through her father. She said she did not have contact information for any living paternal relatives besides the name and state of residence for one. Finally, mother alleged " 'the Indian's stepped in when [she] was in foster care,' " but a review of mother's dependency proceedings shows ICWA was found not to apply to her. The department attempted to call maternal great-grandmother, but the number seemed to be for a fax machine. The department attempted to obtain contact information for five additional relatives by calling maternal grandmother, mother, and two family friends twice. Both times the maternal grandmother, mother, and two family friends' numbers did not work.

The department emailed—but did not send formal notice to—the Cherokee Nation regarding mother's claims of possible Cherokee ancestry. This email included mother's and the children's names along with their dates of birth. The department did not notify either of the other two federally recognized Cherokee tribes: the Eastern Band of Cherokee Indians and the United Keetowah Band of Cherokee Indians in Oklahoma. (See Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs, 89 Fed.Reg. 99899-99901 (Jan. 8, 2024).) The department also sent a fax to the Blackfeet Nation with the names and dates of birth for

4

mother, father, and the children. This fax did not include information about paternal grandfather.

In May 2022, father claimed potential Yaqui ancestry through his maternal grandfather—the children's paternal great-grandfather—Nick M. Father said the paternal great-grandfather was deceased, but that his maternal grandmother—the children's paternal great-grandmother—was alive and may have more information. However, father did not provide the department paternal great-grandmother's contact information, told the department she was not available to talk, and in any case did not like talking about paternal great-grandfather. Father said paternal grandmother was supposed to enroll in the Yaqui tribe, but he was not sure if she did so. He said he did not have paternal grandmother's contact information, and when the department tried to call a number he previously provided for her the person who responded was not paternal grandmother. Nevertheless, the department called a representative of the Yaqui tribe, who was unable to confirm tribal enrollment.

In July 2022 the Department filed an ICWA Declaration of Due Diligence saying they sent formal notice to the Bureau of Indian Affairs (BIA) and the Pascua Yaqui Tribe. These notices contained detailed information about the mother and father, but less detail for extended family members. Though the notice contained the full names of each grandparent, only maternal grandmother had a date of birth, and none had current addresses. The notices did not provide any information about three of the maternal great-grandparents, but had the name and birthdate of one maternal great-grandmother. As to

5

paternal great-grandparents, the notices only provided two names: a paternal great-grandmother and paternal great-grandfather referred to as "Nick M[.]" Only paternal great-grandmother had a current address listed, and neither had a birthdate listed. About a month later, the department received the Pascua Yaqui Tribe's response, which stated that neither the children nor their parents were members of the tribe and that "the Tribe will not intervene in this matter."

The department finally obtained paternal grandmother's contact information in March 2025, about three years after sending the notices. However, she did not respond when the department called her to ask about the children's potential Indian ancestry.

In August 2025, father submitted a parental notification of Indian status indicating he may have Indian ancestry through the "Yaki" tribe. He also filed a Family Find and ICWA Inquiry form, identifying "Nick M[.]" as someone who may have information about the children's Indian ancestry. At a subsequent further section 366.26 hearing, the court asked father who in his family was a registered member of a tribe, and father again identified the paternal great-grandfather. When asked to spell the paternal great-grandfather's name, father spelled his first name "N-i-c-k-l-o-s." He also said the tribe buried the paternal great-grandfather, but could only say he was buried "[s]omewhere in Arizona." Father said he now had paternal great-grandmother's phone number, and the court directed him to give it to the department. Finally, father again repeated that paternal grandmother was supposed to enroll in the tribe, but he did not know if she had and did not have her phone number.

6

In September 2025 the department sent another letter to the Pascua Yaqui Tribe of Arizona, which included the names and birth dates of both parents and both relevant children. It also included the name of paternal great-grandfather, but misspelled his first name as "Nickolas" rather than "Nicklos." The Pascua Yaqui Tribe again responded that the children were not members and were not eligible for membership in the tribe, and that the tribe would not intervene.

In October 2025, the department sent a letter to the BIA "to confirm Native American ancestry for the children," but as of the filing of this appeal the department had not yet received a response.

At the final section 366.26 hearing in November 2025, the court found the department's ICWA inquiry "was proper, adequate, and duly diligent," that there was "no reason to know that the . . . children are Indian children," and therefore ICWA did not apply.

ANALYSIS

Father argues the department failed to conduct an adequate inquiry under California's implementation of ICWA ("Cal-ICWA"). Specifically, father argues the department's notice efforts were insufficient, because they did not contact all Cherokee tribes nor provide formal notice to the Blackfeet tribe. He also argues that its formal notice to the Pascua Yaqui Tribe contained incorrect and misleading information. The department concedes its inquiry was not sufficient because it did not contact two

7

Cherokee tribes or provide formal notice to the Blackfeet tribe with all relevant information.  We agree with the department.

ICWA establishes minimum national standards "for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture."  (25 U.S.C. § 1902.)  Under California law, the trial court and county welfare department have "an affirmative and continuing duty to inquire" whether a child subject to a section 300 petition may be an Indian child.  (§ 224.2, subd. (a); see *In re D.F.* (2020) 55 Cal.App.5th 558, 566 (*D.F.*).)  "This continuing duty can be divided into three phases:  the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice."  (*D.F.*, at p. 566.)

The initial duty applies in every dependency.  (*In re J.S.* (2021) 62 Cal.App.5th 678, 686; see § 224.2, subd. (b)(1).)  The initial duty expands under subdivision (b)(2) of section 224.2, when a child is removed from their home.  Under that provision, if a child is taken into custody, the department's obligation "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."  (§ 224.2, subd. (b)(2).)  Extended family members include adults who are the child's stepparents, grandparents, aunts, uncles, brothers, sisters, nieces, nephews, and first or second cousins.  (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

8

The law requires further inquiry only " 'when "the court, social worker, or probation officer has reason to believe that an Indian child is involved [or, under Cal. Rules of Court, rule 5.481(a)(4), 'may be involved'] in a proceeding . . . ." ' " (*J.S., supra*, 62 Cal.App.5th at p. 687.) " 'When that ["reason to believe"] threshold is reached, the requisite "further inquiry" "includes:  (1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs and State Department of Social Services; and (3) contacting tribes the child may be affiliated with, and anyone else, that might have information regarding the child's membership or eligibility in a tribe." ' " (*Ibid.*)

If at any point during this inquiry the court finds there is "reason to know" a child is an Indian child, the party seeking termination of parental rights must notify the tribe or Indian custodian about the proceedings and their right to intervene in those proceedings. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 5.)  Such "notice must include enough information for the tribe to 'conduct a meaningful review of its records to determine the child's eligibility for membership' [citation], including the identifying information for the child's biological parents, grandparents, and great-grandparents, to the extent known." (*Dezi C., supra*, 16 Cal.5th at p. 1133.)

In short, "[i]f the initial inquiry gives the juvenile court or the agency 'reason to believe' that an Indian child is involved, then the juvenile court and the agency have a duty to conduct 'further inquiry,' [citation] and if the court or the agency has 'reason to

9

know' an Indian child is involved, ICWA notices must be sent to the relevant tribes." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 742.)

"[T]he juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141.) Therefore, if "a juvenile court's findings that an inquiry was adequate and proper and ICWA does not apply are found to be supported by sufficient evidence and record documentation as required by California law [citation], there is no error and conditional reversal would not be warranted even if the agency did not inquire of everyone who has an interest in the child." (*Ibid.*) On the other hand "[i]f a child welfare agency fails to obtain meaningful information or pursue meaningful avenues of inquiry—by, for example, failing to discover that a parent was adopted, or failing to inquire further after a parent identified an extended family member with more information about the child's potential Indian ancestry—those facts would be relevant to whether the initial Cal-ICWA inquiry is adequate." (*Id*. at p. 1151.)

Finally, if our review reveals "error resulting in an inadequate initial Cal-ICWA inquiry," then we must order "conditional reversal with directions for the child welfare agency to comply with the inquiry requirement of section 224.2, document its inquiry in compliance with [California Rules of Court], rule 5.481(a)(5), and when necessary, comply with the notice provision of section 224.3." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1136.)

We agree with the department that, at minimum, it failed in its duty of further inquiry by not contacting all the tribes who may have had information about mother's claims of Indian ancestry. Mother identified possible "Cherokee" and "Blackfeet" heritage. However, as father points out, there are three federally recognized tribes with "Cherokee" in their name, and the department contacted only one of them: the Cherokee Nation. The department concedes that its failure to contact the other two tribes—the Eastern Band of Cherokee Indians and the United Keetowah Band of Cherokee Indians— was error that requires conditional reversal and remand. The department also concedes its communication with the Blackfeet tribe about the children's potential Indian heritage was flawed. That is, the department acknowledges it erred when it failed to provide information about paternal grandfather—the exact person through whom mother claimed Indian heritage.

We agree with the department on both points and accept its concessions. Therefore, we must conditionally reverse the trial court's order terminating parental rights and finding that the ICWA inquiry was adequate, and remand so the department can correct these errors. At minimum, on remand the department should contact the two uncontacted Cherokee tribes, and re-contact the Blackfeet Nation with paternal grandfather's information.

The remaining question is whether the department's notice to the Pascua Yaqui Tribe was also prejudicially deficient. Father argues the notice is flawed because it misspelled paternal great-grandfather's name, despite paternal great-grandfather being

11

the relative through whom father claimed Indian heritage. According to father, paternal great-grandfather's first name is spelled "Nicklos," but the notice says his name is "Nick," and the September 2025 letter to the tribe says his name is "Nickolas." Father argues this error may have made it impossible for the Pascua Yaqui Tribe to determine whether paternal great-grandfather—and therefore potentially the children—had Indian heritage. The department argues this was at most harmless error.

On this point, we agree with the department that there was no error warranting reversal on its own.[3] "The purpose of the ICWA notice provisions is to enable the tribe or the BIA to investigate and determine whether the child is in fact an Indian child. [Citation.] Notice given under ICWA must therefore contain enough information to permit the tribe to conduct a meaningful review of its records to determine the child's eligibility for membership." (*Cheyanne F.*, *supra*, 164 Cal.App.4th at p. 576.)

_____

[3] In *Dezi C.* our Supreme Court held that error in a Cal-ICWA inquiry is not subject to a prejudice analysis and always mandates conditional reversal. (See *Dezi C.*, *supra*, 16 Cal.5th at p. 1152 ["[A] judgment [must] be conditionally reversed when error results in an inadequate Cal-ICWA inquiry. It is only by conditionally reversing that we can ascertain whether error in the inquiry is prejudicial."].) However, it is not clear that this also applies when reviewing alleged ICWA *notice* error. Indeed, *Dezi C.* approvingly cites a case which held that ICWA notice error is subject to a prejudice analysis. (*Id.* at p. 1133, citing *In re Cheyanne F.* (2008) 164 Cal.App.4th 571, 576 (*Cheyanne F.*); see *Cheyanne F.*, at p. 577 ["Deficiencies in an ICWA notice are generally prejudicial, but may be deemed harmless under some circumstances."].) Since notice is a requirement of ICWA and Cal-ICWA, whereas the duty of initial inquiry is found only in state law, our Supreme Court may have intended for us to treat them differently. (See 25 U.S.C. § 1912(a); *In re Austin J.* (2020) 47 Cal.App.5th 870, 882-884 (disapproved of on other grounds in *Dezi C.* at p. 1152, fn. 18) [pointing out that ICWA itself does not impose a duty of inquiry, but does impose a duty to provide relevant tribes with notice.].) Nevertheless, because we conclude the department's notice efforts were satisfactory, and therefore there was no legally significant error, we do not address whether the alleged error was prejudicial.

We conclude the notice contained enough information for the tribe to perform a meaningful review.  In the notice the department did not misspell paternal great-grandfather's name so much as shorten it.  Referring to paternal great-grandfather as "Nick" rather than "Nicklos" is akin to referring to a "Robert" as "Bob" or a "Jillian" as "Jill."  These are common short forms, or nicknames, which we would expect the tribes to be able to connect to the relevant individuals even without their full name.  Indeed, father himself referred to paternal great-grandfather as "Nick," suggesting this was a common alternate name for paternal great-grandfather.  Absent some indication the tribe was or could have been confused by this, we are not convinced this error made it impossible for the tribe to conduct a meaningful review of its records.

Finally, while we agree that the department's September 2025 letter misspelled paternal great-grandfather's first name, we do not conclude this tainted the department's inquiry and notice efforts so severely that we must reverse.  Again, the tribe already received information about paternal great-grandfather—including a name that was likely close enough to his real name for the tribe's purposes.  Under these circumstances we do not believe using the improper spelling in this subsequent letter rendered the department's efforts inadequate

Nevertheless, because we are reversing and remanding for further ICWA inquiry more generally, we would encourage the department to issue corrected notices with any updated or additional information—including the correct spelling of paternal great-grandfather's name.  Such additional inquiry would resolve any alleged defects and

13

provide better and more accurate information to the possibly relevant tribes, and any response would give the department and the court better and more accurate information about the children's possible Indian heritage. Moreover, from this record we see no reason to believe such notice would significantly delay the proceedings. Both times the department contacted the Pascua Yaqui Tribe, the tribe responded in approximately a month.

Because we conclude the department erred by not contacting the uncontacted Cherokee tribes, and by failing to provide critical information to the Blackfeet tribe, we conditionally reverse and remand to permit the department to complete its inquiry.

### DISPOSITION

We conditionally reverse the order terminating the parents' parental rights. We remand the matter to the juvenile court with directions to comply with the inquiry provisions of ICWA and of sections 224.2 and 224.3—and, if applicable, the notice provisions as well—consistent with this opinion. If, after completing the inquiry, neither the department nor the court has reason to know that the children are Indian children, then the court shall reinstate the order terminating parental rights. If the department has reason to know the children are Indian children, the court shall proceed accordingly.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL_____

J.

We concur:
MILLER_____
        Acting P. J.
CODRINGTON_____
         J.